F I L E D
CLERK OF COURT

2024 AUG -8 PM 4: 13

SUPERIOR COURT
OF GUAM



## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| THE PEOPLE OF GUAM,<br><br>vs.<br><br>DONOVAN ALLEN CHARGUALAF ORNELLAS,<br>DOB: 08/16/1980<br><br>Defendant. | Case No. CF0026-21<br>GPD Case No. 21-01607<br><br>**DECISION AND ORDER**<br>**(Finding Defendant Not Competent to Stand Trial by Reason of Mental Illness, Disease, or Defect)** |

## INTRODUCTION

This matter came before the Honorable Alberto E. Tolentino on May 6, 2024, for a Competency Hearing. Defense Attorneys William Pole, Esq. and Terence Timblin, Esq. appeared for Donovan Allen Chargualaf Ornellas ("Defendant"). Assistant Attorney General Sean Brown appeared for the People of Guam ("People"). Having considered Defendant's Forensic Evaluation, the arguments, and the applicable law, the Court hereby **finds Defendant not competent to stand trial by reason of Mental Illness, Disease, or Defect.**

## BACKGROUND

On January 29, 2021, the Grand Jury indicted Defendant on the following charges: (1) Murder (As a First Degree Felony) *Special Allegation: Use of a Deadly Weapon in the Commission of a Felony*, (2) Murder (As a First Degree Felony) *Special Allegation: Use of a*

*Deadly Weapon in the Commission of a Felony*, and (3) Aggravated Assault *Special Allegation: Use of a Deadly Weapon in the Commission of a Felony*. Indictment, January 29, 2021.

On February 3, 2021, the Court ordered a forensic evaluation of the Defendant. Order for Forensic Evaluation, February 3, 2021. Pursuant to 9 G.C.A. § 7.25, the Client Services and Family Counseling Division of the Superior Court of Guam ("CSFC") arranged for Defendant to undergo a forensic evaluation with a qualified psychologist. *Id.* On February 3, 2021, Defendant raised an affirmative defense of mental illness, disease, or defect. Notice of Affirmative Defense, February 3, 2021. Defendant then underwent his forensic evaluation with Dr. Juan Rapadas, an expert clinical psychologist at CSFC. First Forensic Evaluation, March 19, 2021.

On July 22, 2021, Defendant filed an Ex Parte Application for the Appointment of a Psychiatrist to Conduct a Second Forensic Evaluation. On December 10, 2021, the People filed a Response in Opposition to Defendant's Ex Parte Application for the Appointment of a Psychiatrist to Conduct a Second Forensic Evaluation. On April 20, 2022, the Court issued a decision and order granting Defendant's application for the appointment of a psychiatrist. Decision & Order, Ex Parte Application for the Appointment of a Psychiatrist to Conduct a Second Forensic Evaluation. April 20, 2022. On June 20, 2022, Defendant filed a Motion to Amend the Order for Second Evaluation and Memorandum of Points and Authorities. On June 22, 2022, the People filed an Opposition to Amend the Order for Second Evaluation and Memorandum of Points and Authorities. On June 27, 2022, Defendant filed a Reply to Government Objection to Amended *(sic)* the Order for a Second Forensic Evaluation and Examination. On July 27, 2022, Defendant filed an Amended Order for Second Forensic Evaluation and Examination. On September 12, 2022, the Court filed an Order granting client

services more time to conduct a second evaluation. Defendant then underwent a second forensic evaluation with Dr. Stephen H. Behnke. Second Forensic Evaluation, February 5, 2024.

The Court held a hearing on May 6, 2024, to determine Defendant's competency to stand trial. Minute Entry, May 6, 2024. After hearing the arguments of the parties, the Court took the matter under advisement.

## DISCUSSION

"A defendant is incompetent to be proceeded against in a criminal action if, as a result of mental illness . . . he is unable (1) to understand the nature of the proceedings, (2) to assist and cooperate with counsel, (3) to follow the evidence, or (4) to participate in his defense." 9 G.C.A. § 7.37(a)(1)–(4). On February 3, 2021, Defendant raised an affirmative defense of mental illness, disease, or defect. Shortly thereafter, the first forensic evaluation occurred in March 2021, and Defendant was found competent to be proceeded against. *Id.* Per the Defendant's request, the Court ordered a second forensic evaluation in July 2022 to determine if Defendant was competent to stand trial. *Id.*

### I. Forensic Evaluation with Dr. Rapadas

Defendant's first forensic evaluation was conducted on February 25, 2021 by Dr. Juan Rapadas. During the forensic evaluation, Defendant was administered (1) the MOCA (Montreal Cognitive Assessment), (2) the Adult Sentence Completion Test, (3) the MCMI-IV (Million Clinical Multiaxial Inventory, 4th edition), (4) the BRIEF-A (Behavioral Rating Inventory of Executive Function-Adult Version), and (5) the ECST-R (Evaluation of Competency to Stand Trial-Revised). First Forensic Evaluation, March 19, 2021. After being informed that the evaluator was employed by the court, Defendant appeared to have an understanding of the above facts about his forensic evaluation. *Id.* at 2.

Defendant wrote a police statement admitting to using ice/meth the morning of the murder at the victim's home. *Id.* Throughout the interview, Defendant's history was marked by drug use. *Id.* at 4. Defendant dropped out of high school and afterward admitted to "getting into and involved in the "drug world" and finish school, which he did." *Id.* Defendant also admitted that he lost his position at G4S Security Services and the police reserves because he "got involved with the "wrong group". He started missing work and calling in sick, and in 2018, he tested positive for drugs". *Id.* Defendant said he turned to drugs when failed to "help his girlfriend get some justice for a sexual assault incident" and he turned to drugs "to feel good and to feel at peace within his mind". *Id.*

Defendant's appearance at the time of the interview was neat with normal hygiene. *Id.* at 5. His posture was relaxed, and he was friendly and very respectful during the evaluation. *Id.* Defendant seemed interested and motivated to do the testing correctly, he remembered details of his recent and remote past, and maintained good eye contact. *Id.* Defendant's mood was euthymic with some melancholia, mostly when speaking about his kids. *Id.* Defendant's speech flow was good and his speech was easy to understand. *Id.* at 6. His thought content was good and appropriate to mood. *Id.* However, Defendant's fund of general knowledge was estimated to be "between low average and average, at best, based on his reported educational, occupational, and academic history". *Id.*

Defendant scored a 25/30 on the MOCA test, indicating someone that is not overtly suffering from overall cognitive weaknesses and/or memory issues. *Id.* The score reflected problems in delayed recall ability and language. *Id.* The Adult Sentence Completion test revealed thought processes that were "largely logical and mostly easy to follow" and "not bizarre or psychotic in content just very 'wordy'". *Id.* Defendant's score on the MCMI-IV test

suggested disorders "in the areas of Delusional Disorder and Other (or Unknown) Substance Use Disorder". *Id.* at 8. The test suggests that the "following personality disorder fit him best: Paranoid Personality Disorder, Narcissistic Personality Type, Unspecified Personality Disorder (Negativistic) Type, and Unspecified Personality Disorder (melancholic) Type. *Id.* The results of the MCMI-IV protocol suggest that Defendant has "at least a moderate degree of pathology" which "characterizes his overall personality organization". *Id.* at 9. The ECST-R (Evaluation of Competency to Stand Trial-Revised) T-score below 65 revealed that it is very likely that Defendant would have factual understanding of the courtroom proceedings, rational understanding of the courtroom proceedings, and the ability to consult with counsel. *Id.* at 12.

Based on the tests conducted and the forensic interview, Dr. Rapadas concluded that Defendant was currently competent to be proceeded against and to be sentenced. *Id.* During the two and a half hour interview, Dr. Rapadas remarked that Defendant "never said anything or displayed any behaviors that could be interpreted as bizarre, psychotic, or even just unusual". *Id.* at 19. There were a couple of exceptions noted:

> "There are a couple of exceptions. When he described how he concluded that Mr. Castro was a real threat to him and his family, he talked about colors, deep heritage, gestures and hand movements from the victim, and devil imagery that on its face, seemed hallucinatory. The second exception was when Donovan was observed by police to be talking to someone (sic) the interview room when no one was there."

Id. at 20.

Dr. Rapadas attributed these behaviors to "transient psychotic symptoms", and that Defendant did not lack substantial capacity to know or understand what he was doing, to know or understand that his conduct was wrongful, or to control his actions, or to the extent which, as a "consequence

of mental illness, disease, or defect, the defendant did not have a state of mind relevant to the issues in the trial of action". *Id.*

**II. Forensic Evaluation with Dr. Behnke**

Defendant's second forensic evaluation was conducted on July 25, 2022 by Dr. Stephen Behnke. Second Forensic Evaluation at 1, February 5, 2024. Defendant was basically oriented to time, person, place, and object throughout the forensic evaluation. Forensic Evaluation at 9. Defendant's flow and speech quality were normal, only becoming pressured and difficult to interpret when discussing content of a religious nature. *Id.* Defendant possessed a rational factual understanding of the proceedings against him and could fully articulate his current charges. *Id.* at 10. Defendant was able to detail aspects of his childhood, family life, education, and work history. *Id.* at 4. Defendant's demeanor was cooperative and respectful, laughing at appropriate times and becoming emotional and teary-eyed when discussing his significant other and children. *Id.* at 9.

It is noteworthy that Defendant admitted to using methamphetamine as an adolescent, continuing to use methamphetamine throughout his adult life. *Id.* Yet, despite a lifelong history of recreational drug use, Defendant is currently refusing to take any psychiatric medication, having been asked on at least two occasions by mental health professionals at CFSC whether he would like to consider taking them. *Id.* at 9.

None of the psychological assessment tools used in the first forensic evaluation were re-administered during the second forensic evaluation, but were reviewed by Dr. Behnke for their accuracy and conclusions. *Id.* It is also noteworthy that the MCMI-IV Interpretive Report from the first forensic evaluation states "this man exhibits a number of symptoms that are characteristics of a delusional disorder, such as transient ideas of reference, feelings of

grandiosity, and irrational jealousy…he ruminates and weaves his suspicions into a network of invalid beliefs". *Id.*

In the evaluation, Dr. Behnke emphasized that, when discussing the legal process outside of the context of Defendant's own case, Defendant could correctly explain the charges against him and the legal process ("i.e. the role of court personnel, the meaning of evidence, the possible consequences of a guilty verdict, the difference between misdemeanor and felony, and the advantages/disadvantages of a plea bargain depending on the status of one's actual guilt"). *Id.* at 10. However, within the context of Defendant's own case, there is a significant detachment from reality that is indicative of a high level of delusional thinking. *Id.* The delusional beliefs include:

1) Defendant's current case, including the forensic examiner, is a drama that "reaches back deep into history and incorporates the cosmos in preparation for the Second Coming of Christ ("Parousia").
2) World leaders "will turn their attention to the courtroom in Guam when the trial takes place", and the case will receive "global attention". Defendant repeatedly refers to the coronation of King Charles of England in both his written and oral statements.
3) Defendant believes that "The Truth" will be revealed to the world during the trial, the beginning of which Defendant fervently seeks to expedite. The truth is part of a 50+ page "Parable Report", prepared by Defendant, consisting of 50+ pages of handwritten notes that mix passages of Scripture with Defendant's own commentary.
4) The notes in the "Parable Report" explain how the biblical quotations apply to Mr. Ornellas' case and how the case fits into unfolding cosmic events.

*Id.*

Further, Defendant does not believe that a psychiatrist can conduct a forensic evaluation without being able to also conduct a "psyche evaluation" because the Defendant, like Mr. Ornellas claims, is one of "God's elect". *Id.* at 11. Defendant asserts that, if an evaluation of Defendant is not conducted by one of God's elect, the evaluator will be "unable to discern the difference between the TRUTH and a LIE". *Id.* This is because, as one of God's elect, Defendant

believes that he possesses spiritual gifts, and that the trial must be interpreted in the context of his "idiosyncratic" interpretation of biblical texts. *Id.* Defendant is aware that other people would think his beliefs crazy, and as such Defendant chooses to keep his thoughts to himself, but nevertheless "evinced scant ability to reflect on the contents of these thoughts". *Id.* at 12.

**III. Analysis**

Here, it is evident that both evaluations were conducted under much different circumstances and time constraints, which ultimately produced different conclusions regarding the Defendant's competency on the part of the evaluators. By Dr. Rapadas' own admission, he was only able to conduct one two-hour interview with the Defendant during the first evaluation, whereas Dr. Behnke was able to conduct four extensive interviews with the Defendant. Minute Entry at 10:38:45, May 6, 2024. Further, Dr. Rapadas confirmed that he did not have access to the Defendant's seven-page handwritten notes, or the fifty-six page "Parable Report" cited in Dr. Behnke's evaluation, and was unaware of their existence until reviewing the latter's notes. Minute Entry at 10:37:15, May 6, 2024. When questioned, Dr. Rapadas revealed that fervent religiosity is a rare theme to occur during a forensic evaluation, perhaps only occurring in about 20% of total interviews. Minute Entry at 10:39:50, May 6, 2024. Dr. Rapadas concedes that Defendant's condition could have worsened over the three years that he has been incarcerated, with the caveat that it is difficult to determine the degree to which a delusional disorder could worsen in terms of the Defendant's beliefs and how they comport with reality. Minute Entry at 10:41:10, May 6, 2024. It was known by Dr. Rapadas that Defendant had strong religious beliefs that affected his behavior. Minute Entry at 10:43:20, May 6, 2024. However, when questioned Dr. Rapadas agreed that the existence of such fervently religious comments and documents would have potentially altered his findings. Minute Entry at 10:46:18, May 6, 2024. Moreover,

Dr. Rapadas admits that Defendant's beliefs contributed to his rationale for beheading the victim, and that those beliefs ("deep heritage showings", devil-like clothing and symbols, and the need to behead the victim because they were a demon who threatened to kill Defendant's family) *were evident* during the first evaluation, but for some reason did not weigh heavily during the competency analysis. Minute Entry at 10:55:37, May 6, 2024.

Taking the results of both forensic examinations in total, the Court finds that Defendant is currently not competent to proceed against or to be sentenced. Dr. Behnke stated that Defendant suffers from a delusional disorder and has a firmly held set of beliefs that do not comport with reality. Second Forensic Evaluation at 13, February 5, 2024 . Dr. Rapadas also concluded that Defendant suffered from a delusional disorder but attributed it to drug-induced psychosis at the time of the first forensic evaluation. First Forensic Evaluation at 20, March 19, 2021. However, there was a distinct lack of feverish religiosity in Defendant's language and worldview during the first forensic evaluation, the lack of which, by Dr. Rapadas' own admission, led to his conclusions about the Defendant's competency. Dr. Behnke finds that Defendant's religious convictions regarding the cosmic unfolding of the Second Coming of Christ "overwhelms his rational understanding of the trial process when he applies his knowledge to his own case". Second Forensic Evaluation at 13, February 5, 2024. Because of these potentially worsening and deeply held delusional beliefs, it is clear that Defendant is incapable of understanding the legal proceedings against him. Therefore, Defendant cannot meaningfully participate in building his legal defense strategy.

While it is possible that Defendant could be restored to competency through psychotherapy and medication, Defendant's refusal to comply with such methods, as well as the

current pervasiveness and rigidity of Defendant's delusional beliefs, prevents competency. *Id.*

Defendant fails all four prongs of the competency test for the following reasons:

1) Defendant does not understand that the proceeding is entirely secular in nature and governed solely by Guam law and Guam criminal procedure. *Id.* at 14.
2) Defendant is unable to assist and cooperate with his counsel because he cannot consider possible defenses separate from his rigidly-held religious/theological beliefs. *Id.*
3) Defendant is not able to follow the evidence because he believes evidence will include his testimony regarding messages he has received from God as one of God's "elect" who has "spiritual gifts". *Id.*
4) Defendant is not able to participate in his defense because he views the trial process as grounded in preparation for the Second Coming of Christ. *Id.*

Therefore, transfer to Mental Health Court is appropriate so that Defendant can work on complying with his treatment with the help of GBHWC.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

## CONCLUSION AND ORDER

For the above reasons, the Court makes the following findings of fact and conclusions of law:

- Defendant is currently not competent to stand trial and possess neither the mental competency "(1) to understand the nature of the proceedings, (2) to assist and cooperate with counsel, (3) to follow the evidence, or (4) to participate in his defense." *See* 9 G.C.A. § 7.37(a)(1)–(4).

- Defendant's case will be transferred to Mental Health Court.

SO ORDERED, this _____ day of ____ **AUG 0 8 2024** ____ 2024.



_____
HONORABLE ALBERTO E. TOLENTINO
Judge, Superior Court of Guam

**SERVICE VIA E-MAIL**
I acknowledge that an electronic
copy of the original was e-mailed to:
AG,
W.Able
8/8/24  4:45pm
Date        Time
Antonio R Cruz
Deputy Clerk, Superior Court of Guam